· THE HARLEM GASLIGHT COMPANY, Respondent, *v.* THE
MAYOR, &C., OF NEW YORK, Appellants.

When a lawful contract has been made with a municipal corporation, and it has
been fulfilled by the creditor, he is entitled by implication of law to a reason-
able compensation, in the absence of any specific agreement as to price or
rate of payment.

A contract for gas, to light the public buildings and streets of the city of New
York, is within the authority of the municipal corporation.

Where the agreement is for the use by the city of gas belonging to a manu-
facturer who is in the enjoyment of a practical legislative monopoly, the case is
not within the proviso of the city charter, which requires contracts for sup-
plies, involving expenditures beyond $250, to be made in writing with the
lowest bidder, on an advertisement for sealed proposals. (1 Sess. Laws 1857,
886, § 38.)

A contract prescribing the rate of compensation for the use of gas during a
particular year, is not in its nature an agreement running from year to year,
and cannot be held to fix the measure of compensation for subsequent use.

THE plaintiff has for many years provided the gas, with
which the streets and public buildings have been lighted in
that part of the city of New York north of the center of
69th street.   The rates at which it was furnished were never
fixed by express contract, except for the year preceding the
9th of July, 1859.

From that time, until the month of August, 1864, the bills
of the company were rendered and paid from month to
month, at the rates designated in that written agreement.

On the 24th of August, 1864, the company gave notice in
writing to the municipal authorities, that the cost of manu-
facturing gas had more than doubled, and that on and after
the first of the ensuing month, it would charge the city at the
rate of $50 per annum for lighting each of the street lamps
north of the center of 79th street.

There were 3,129 of these lighted in the month of Septem-
ber; and the gas therefor was furnished by the company, and
is conceded to have been worth the sum of $13,037.50, being
at the rate of $50 a year for each lamp.

During the month of September no formal action was
taken on the subject by the common council.   The lamps,

however, were lighted under the authority of previous resolutions and ordinances, and by the direction of the superintendent of lamps and gas.

Subsequently the company was served with a resolution adopted by the common council, for lighting Eighth avenue from 84th to 125th street with gas from the mains of the plaintiff.

The company rendered its bill against the city for the amount furnished in the month of September, together with the tax imposed upon the plaintiff by the United States revenue law for the gas so furnished and consumed, amounting in all to the sum of $13,758.53; and the city comptroller refused to pay it on due presentment and demand.

The company was incorporated in 1855, under the provisions of the act to authorize the formation of gaslight companies, "for the purpose of manufacturing and supplying gas for lighting the streets, and the public and private buildings, &c., in all that part of the city lying north of the center line of 79th street.

The act of 1848, provides, among other things, that "any corporation formed under this act shall have full power to make and sell, and to furnish such quantities of gas as may be required in the city, &c., for lighting the streets, &c.; and to lay conductors through the streets, &c., with the consent of the municipal authorities. (3 Edmonds' Statutes at Large, 849.)

On the 25th of April, 1855, the common council gave the requisite consent, on condition that the plaintiff should comply with the terms prescribed in the resolutions. These requirements were fulfilled; and the company furnished the gas, the lamps belonging to the city, and being erected pursuant to resolutions passed, from time to time, by the common council.

In 1857, and ever since that time, the duty of superintending the lighting of the public streets has been charged on the bureau of lamps and gas, and the superintendent of lamps and gas, who is the chief officer of that bureau, is required to take charge of and superintend the construction and lighting of the public lamps.

Every year since 1855, on the representations of the common council of the amount necessary for lighting the streets with gas, certified by the appropriate head of department, the legislature has authorized such amount to be raised.

In the spring of 1864, the amount thus applied for and certified was $430,427; and the sum of $420,000 was, by authority of the legislature, raised by taxation, and appropriated to this purpose by ordinance of the common council.

At the time the demand was made upon the comptroller, there remained of the appropriation unexpended, more than sufficient to satisfy the amount in question.

The corporation resisted the claim on two grounds:

1. That there can be no recovery, as the contract was one for supplies exceeding $250 in value, and not having been concluded in accordance with the requirements of the statute, it was therefore illegal and void. (1 Laws of 1857, p. 886, § 38.)

2. That if otherwise, there was an implied contract between the parties, running from year to year, by which the gas was to be furnished at the rates fixed by the written contract, which by its terms expired on the 9th of July, 1859.

The questions at issue were submitted on an agreed case pursuant to the 372d section of the Code. The Superior Court at General Term directed judgment for the plaintiff for the value of the gas furnished, and for the amount of the revenue tax imposed on the plaintiff by the government.

From that judgment the defendants appealed to this court.

*William F. Allen,* for the appellants.

I. The question intended to be submitted is, as to the amount to which the plaintiff is entitled for the supply of gas to the public lamps north of 79th street, for the month of September, 1864.

The plaintiff claims at the rate of $50 per annum for each lamp, as upon a *quantum valebat,* while the defendants insist that the compensation should be at the rate of $28.30 per annum for each lamp, as prescribed by the contract of July 9, 1858. To entitle the plaintiff to a judgment for the

amount claimed, a valid contract for the payment of the sum claimed must be established, either express or implied. It is not pretended that any express contract for the payment of the $50 per lamp exists, but the circumstances are relied upon as raising an implied promise to pay that sum.

II. It will not be contended that, in the absence of any restriction or limitation of the corporate powers or legislative restraint upon the officers and agents of a corporation, contracts may not be implied against corporations as against natural persons. But whenever the organic law of the corporation or the statutes of the State prescribe the mode and manner in which contracts shall be made, and prohibit and declare void all contracts not made in pursuance with the requirements of law, such contracts are only valid as comply with the statutes, and no claim for services, materials or other thing furnished, except under a contract so made, will give a cause of action against the corporation. (*Brady v. The Mayor, &c.*, 2 Bosw., 173; *S. C.*, affirmed, 20 N. Y., 312; *Appleby v. The Same*, 15 How., 428; *McSpedon v. Mayor*, 7 Bosw., 601.)

No ratification or confirmation of the contract by any or all the corporate authorities, or acceptance of benefits under it, will bind the corporation, if the statute has not been complied with.

III. The charter of the city of New York and the several acts amending the same are public acts, and every citizen is presumed to know them, and is chargeable with knowledge of every provision affecting his dealings with the city; and if the subject matter of the contract is within a provision of law, the individual must see that the forms of law are apparently complied with. The subject matter of this claim is the supply of gas, amounting to more than $250 in the aggregate and more than $250 for a single night. The plaintiff had, on the 9th of July, 1858, entered into a contract, which was duly, that is, after a compliance with the requirement of law, made for the supply of gas to the city. There was then, in this case, actual notice and knowledge of the provisions of law relating to contracts for supplies.

IV. The "street department" have the cognizance of lighting the streets, wharves, &c., and "a bureau of lamps and gas" is created within that department, and the duties of the chief of that bureau are prescribed by ordinance. (Amended Charter of 1857, § 23; Revised Ordinances of 1859, ch. 4, art. 1, § 2, p. 79; id., art. 9, § 2, p. 99.)

The supply of gas or other materials for lighting the streets is within the province of the street department, and contracts for such supply are to be made by the street commissioner. (Amended Charter of 1857, § 38; Valentine's Laws, p. 278.)

A violation or evasion of this provision is a misdemeanor. (Id., § 40.)

The common council could not, directly or indirectly, contract for the supply, nor by any act of theirs lay the foundation of an implied promise to pay for lighting the streets, except as they might direct and control the street commissioner. (*Farmers' Loan and Trust Company* v. *The Mayor, &c., of New York*, 4 Bosw., 80.)

Notice to the "corporation," that is, notice to the "mayor, aldermen and commonalty," how served or to whom given does not appear, was not notice to the head of the "street department," who was charged by law with the supervision of lighting the streets.

Notice to the common council, and their omission to take "final action" upon the subject, could not raise an implied assumpsit against the city, as the subject was not, any more than providing a pier for the deposit of offal was, within their province.

V. The supply of gas for the lamps within the district mentioned, is within the provisions of the thirty-eighth section of the amended charter of 1857, and could only be furnished upon contract made as prescribed in that section. (Valentine's Laws, p. 278.)

1. It was a "supply needful for a particular purpose."

2. It involved the expenditure of more than $250.

3. It was a supply within the "cognizance" of the street department. (See, also, Revised Ordinances of 1859, ch. 4, art. 2, § 3.)

4. It was not a contract or requisition for service requiring skill or science, so as to bring it within the case of *People* v. *Flagg* (17 N. Y., 184), and the argument of Judge Comstock in that case.

5. It did not relate to the acquisition of a particular property for a special purpose, in the selection of which the judgment and discretion of the city officials would be called into action, as in the selection of a site for a market, so as to bring it within the argument of Judge Hoffman in *The Farmers' Loan and Trust Company* v. *The Mayor*, &c. (2 Bosw., 173).

The statute does not relate to and include all work and all supplies, the contract for which is to be made by the head of an executive department. (*Smith* v. *The Mayor*, &c., 21 How., 1; *McSpedon* v. *The Same*, 7 Bosw., 601.)

It is no answer that there was but one gas company within the district. The streets might have been lighted with oil or other suitable material, and notice might have been given for bids for gas, oil, kerosene or other suitable material, or other gas companies might be organized and licensed by the city to lay pipes and conductors over the same territory. .

VI. The contract of the 9th July, 1858, was in substance and effect renewed from year to year. The street commissioner having once advertised for bids and duly made a contract with the plaintiff for a single year, and for a yearly compensation, which the plaintiff was willing to treat as a continuing contract from year to year, exercised his discretion in the matter, and instead of formally advertising when there was no change in the price of any article with which the streets could be lighted, or any change in the circumstance authorizing the presumption that a contract more advantageous to the city could be made, assented to the yearly renewal of the contract.

It was as if notice for bids had been published annually, and the plaintiff had made the lowest bid, and a new contract had been duly made. Each party regarded and treated the old contract as in force, and as renewed from year to year. Each party observed all its forms, and without doubt

either party could have maintained an action for a violation of any of its provisions. A liberal interpretation of the statute, and for the purpose of upholding the contract and saving the city officials from the pains and penalties denounced against a violation of the laws (see amended Charter of 1857, § 40), would authorize such informal renewal. But it would not authorize a renewal at an increased price, that is, the making of a new contract. The plaintiff having received pay for the annual supply for the several years since 1858, cannot now object that there was no valid contract under which the gas was supplied. It has been acted upon as a valid contract.

VII. If the last proposition is not true, then there has been no valid contract for the supply of gas since the 9th of July, 1859, and all the payments made have been without authority of law, and the plaintiff has no legal claim even for the original contract price, or any sum whatever. (*Brady* v. *Mayor*, 2 Bosw., 173; 20 N. Y., 312, *S. C.*; *Appleby* v. *Mayor*, &c., 15 How., 428.)

The statute (amended charter of 1857, § 40) makes it a penal offense to evade the provisions of the charter, and it follows that a contract made in violation of the regulations designed for the public good, to insure an economical administration of the city government, cannot be inferred. (*Levy* v. *Yates*, 8 A. & E., 129; *Steaines* v. *Wainwright*, 8 Scott, 280; *Taylor* v. *Crowland Gas Co.*, 10 Ex., 293; *Candrell* v. *Dawson*, 4 C. B., 376, 399; *Little* v. *Poole*, 9 B. & C., 192; *Armstrong* v. *Lewis*, 2 C. & M., 274.)

But the right to the contract price is not disputed. The claim is that there is no valid contract, express or implied, to pay an increased price.

VIII. The contract, as originally made, was for a year, and when renewed or acted upon as a renewed contract it was continued in force for a year, and as an annual contract, and became obligatory upon each party for the entire year. Neither party could, during the year, rescind it. It was like a lease of a house or hiring of service for a year, at an annual rent or a compensation by the year. A continued occupation

by the tenant with the permission of the landlord, or a continuation of the service with the assent of the employer, beyond the year, would work a renewal of the lease or hiring for a second entire year, and not for a part of the term and to be terminated at the option of either party. (See opinion of court, as to effect of receipt of rent from tenant holding over, in *Jackson* v. *McLeod*, 12 Johns., 182; *Anderson* v. *Prindle*, 23 Wend., 616; Chitty on Contracts, 20; *Eversten* v. *Sawyer*, 2 Wend., 507; Chitty on Contracts, 323.)

IX. The contract, then, as renewed, or continued in force from year to year, expired on the 9th of July, 1864, and the plaintiff having, with the acquiescence of the street commissioner and the chief of the bureau of lamps and gas, continued to furnish the city with gas for nearly two months, receiving pay therefor under the contract, the contract was legally renewed for the year, which will expire on the 9th of July, 1865, and neither party is at liberty to terminate or vary the same without the consent of the other before that time. The plaintiff cannot, therefore, claim the increased price.

X. Even had the contract been between individuals, the notice served on the 22d of August, of an intention to claim an increased price, would not have been unavailing; the party served would not have been bound to take any notice of it.

XI. But in the case of the defendants it was entirely insufficient and without significance. It could not lay the foundation of an implied promise to pay the increased price demanded.

1. There was a valid contract for the supply of gas to the 9th of July, 1865, and the city authorities were under no obligation to consider a proposition to vary its terms, and cannot by silence be deemed to have acquiesced in any change.

2. The statute prescribes the mode and manner of making contracts for the furnishing supplies exceeding in amount $250, and names the officers by whom they shall be made. The plaintiffs well knew this, not only as every citizen knows

the law, but as having been a party to a contract duly made under the law.

3. There can be no such thing as an implied promise in the case. The common council were not capable of promising expressly, and cannot, therefore, by any act lay the foundation for an implied promise.

4. The remedy of the plaintiff was to cut off the gas, and refuse to furnish until another contract was duly made, if they were not bound for the year by the contract of 1858, and not to furnish gas contrary to law and without law, and then claim on a *quantum valebat*.

To uphold this claim would be to condemn the city officials for a violation of law.

*Henry P. McGoun* and *Henry H. Anderson*, for the respondents.

I. The duty of lighting the streets of the city is one of the duties by law imposed upon the defendants, and they are bound to pay the expense attending the discharge of that duty. (Val. Laws, p. 273, § 23; *Furze* v. *The Mayor, &c., of New York*, 3 Hill, 612; *Hutson* v. *The Mayor, &c., of New York*, 5 Seld., 168.)

1. The plaintiffs, by their charter, have authority from the legislature to manufacture and furnish gas to the defendants for lighting the streets in the district occupied by them. (Sess. Laws of 1848, p. 61, § 18.)

2. In the discharge of the duty imposed upon the defendants, and for the benefit of the city, they consumed gas of the plaintiffs worth the amount for which judgment was rendered below.

3. The defendants, by authority of the legislature in 1864, received and now hold money enough to pay the amount claimed, raised expressly for the purpose of such payment, and appropriated by the common council therefor.

4. There would seem to be no just reason for withholding payment.

II. No written agreement between the plaintiffs and the defendants is necessary. The facts presented in the case

create a contract to pay for the gas consumed what the same is reasonably worth. The doctrine that corporations can be bound by implied contracts, to be deduced by inference from corporate acts, without either a vote or deed in writing, is established in this country with great clearness and solidity of argument. It cannot now be disputed. (3 Kent's Com., 291; *Bank of Columbia* v. *Patterson*, 7 Cranch., 299; *Bank of U. S.* v. *Dandridge*, 12 Wheat., 74; *Perkins* v. *Washington Ins. Co.*, 4 Cow., 645; *Am. Ins. Co.* v. *Oakley*, 9 Paige, 496; *Magell* v. *Kauffman*, 4 Serg. & Rawle, 317; *Randall* v. *Van Vechten*, 19 Johns., 60.)

1. It may be said that the plaintiffs, by the terms of the resolution of April 25, 1855, and by their charter, became bound to supply gas to be used by the corporate authorities as well as by private consumers, and if so, a reciprocal obligation arose on the part of defendants to pay the value of the gas consumed. By the agreement made July 9, 1858, continuing in force for but one year, the value for that year was fixed at the rate of $28.80 for each lamp, estimating such lamp to be lighted 3,800 hours, and to burn three cubic feet of gas per hour, and a *pro rata* price was to be paid for each additional hour. After the expiration of that agreement either party was at liberty, at any time, to refuse to be bound by the price named in the terminated agreement, and the measure of compensation for gas consumed after such refusal must necessarily be the actual value of the gas consumed.

The notice of 22d August, 1864, terminated any obligation on the part of the plaintiffs to be bound by such price after the first of September, 1864, and the reason assigned in the notice is abundantly sufficient to justify it.

If the rate named in the notice of 22d August, 1864, had been more than the gas was worth, a question might have arisen, whether the corporation were bound to the price named in that notice; but it is unnecessary to consider that question in this case, for it is conceded that the gas consumed was worth fully the amount claimed.

2. Section 38 of the act of 1857 is not applicable to this

case and imposes no restriction upon the defendants in the performance of their duty in the premises.

This section provides first, that whenever a contract is "made or let by authority of the common council" (*i. e.*, whenever the common council shall direct a contract to be made or let), such contract shall be made or let by the appropriate head of department, without further action on the part of the common council and in the manner prescribed by their ordinances, in other words, when the common council have authorized a contract, its execution devolves upon an executive department.  2d.  Whenever "work is necessary to be done to complete or perfect a particular job, or any supply is necessary for a particular purpose, which work is to be undertaken or supply furnished for the corporation, and the several parts of said work or supply shall together involve the expenditure of more than $250, the same shall be by contract" unless ordered otherwise, and all such contracts shall be given to the lowest bidder, &c.

The claim here made evidently comes within neither clause of this section, and as to it the general liability of the defendant to pay for what has been used by it or by its authority is unrestricted.

The first clause was probably intended to apply to matters forming the subject of assessment. (See Laws of 1861, ch. 308, p. 702.)

The second clause has reference to a work undertaken and abandoned, and to laying in supplies of those articles which may be bought in quantity, such as coal, stationery, furniture, books, &c.

But it is evident from the provisions of the section that it relates only to such matters as can properly be the subject of general competition, and can safely be awarded to the lowest bidder.  When extended to matters not properly the subjects of competition, it ceases to accomplish its object and defeats the intentions of the legislature.

In *The People* v. *Flagg* (17 N. Y., 584), COMSTOCK, J., says:

"The amended charter of 1853 requires that all work to be done and supplies to be furnished for the corporation,

involving an expenditure of more than $250, shall be by contract founded on sealed bids, or on proposals made in compliance with public notice for the full period of ten days, and all such contracts when given, shall be given to the lowest bidder with adequate security. It is claimed on the part of the appellant, that the services performed by the relator should have been contracted for with the lowest bidder, pursuant to the requirement of the charter. The language of this provision is somewhat broad, but I am quite well satisfied that it does not include the services of the particular kind now in question. In a large sense the term ' work ' may include all labor, whether mental or corporeal, but it has a more restricted sense which may confine it to the various kinds of manual labor which may properly be the subject of general competition, and can safely be awarded to the lowest bidder. It would be an unreasonable and mischievous construction of the statute to apply it to services which require, as their proper performance, scientific knowledge or professional skill. I do not believe that the services of a lawyer, of a physician, or those upon which the claim in the present case is founded, are embraced within the provision."

In *The Farmers' Loan and Trust Company* v. *The Mayor, &c., of New York* (4 Bosw., 89), HOFFMAN, J., speaking of this restriction, says:

" It is clear, however, that there must be a class of cases in which the very object of the exercise of a municipal power would indicate the inapplicability of the provision. The establishment of a market within a particular district of the city, calls for the exercise of discretion in choosing the locality so as to meet the convenience of the greater number, and facilitate the means of cleansing, which may be wholly defeated or impaired if the corporation was compelled to advertise and take the plot of ground offered by the lowest bidder," &c.

3. The provisions of section 38 are inconsistent, and, without reference to the conduct of city affairs, unintelligible. The section must be interpreted by considering what it was intended to accomplish, what to prevent, and by regarding the circum-

stances of the case to which it is to be applied.   As interfering in some degree with the rights of the corporation vested in it by its ancient charters, it must be limited to those things clearly intended to be affected by its provisions. (Val. Laws, p. 240, § 40.)

Certainly that for which compensation is claimed in this case is not reached by it.   This claim is neither for work done or supplies furnished, within the meaning of the act.   Under no circumstances would the manufacture and conducting of gas to street lamps be a subject for general competition.   The act of 1848 is in conflict with the idea.   Too great outlay is required in preparing for the manufacture of gas.   The opening of streets for laying gas pipes by every one, would be both impracticable and impossible.   The legislature has recognized this, both in the act of 1848, already cited, and by their action in the tax levy of 1864 providing means to pay this very indebtedness.

4. The defendants, in aid of their position, refer to two or three cases, one of which only, *Brady* v. *The Mayor, &c.* (20 N. Y., 312), was decided in this court.   It is unnecessary, in order to establish our claim, to controvert those cases. They are not controlling in this case.

(*a.*) They arose under the act of 1853, which differs materially from the act of 1857, and was repealed by it.

(*b.*) The "work done and the supplies furnished," forming the subject of litigation in those cases, came exactly within the admitted signification of those words, as used in the act of 1853.

(*c.*) Those cases were brought upon written contracts, made in entire disregard of the provisions of the charter and ordinances of the city, and in violation of the spirit and letter of both.

In *Brady* v. *The Mayor, &c.*, DENIO, J., says: "It is not necessary to deny that one who has *bona fide* performed labor under a contract which is void from a failure to comply with the statutes, may maintain an action against the city to recover a *quantum meruit* where the work has been accepted by the city and has gone into use for public purposes." (20 N. Y., 310.)

That case makes for rather than against us.

TIFFANY.—VOL. VI.    41

III. A statute should not be construed to work a public mischief. The construction claimed by the defendants would work a greater mischief than any the statute was intended to prevent. (*People* v. *Laimbier*, 5 Denio, 9.)

The streets cannot be lighted except by using the gas of the plaintiffs; and to plunge the streets into darkness would work irreparable injury to the whole city above 79th street. Such could not have been the intention of the legislature, acting when the same state of facts existed. And yet the lamps cannot continue to be lighted unless the gas consumed is paid for.

1. The intention of the legislature is to be gathered from other acts in *pari materia*, as well as from the act itself. Sometimes it is to be collected from the cause or necessity of the statute, and sometimes from other circumstances, and whenever it can be discovered it ought to be followed with reason and discretion in the construction, although such construction seems contrary to the letter of the statute. (*People* v. *Utica Ins. Co.*, 15 Johns., 358.)

A thing within the letter of the statute, is not within the statute, unless it be within the intention of the makers. (*Jackson* v. *Collins*, 3 Cow., 89; *James* v. *Patten*, 2 Seld., 9; *People* v. *Draper*, 15 N. Y., 532; *The King* v. *Younger*, 5 T. R., 449; *Margate Pier Co.* v. *Hannam*, 3 B. & A., 266; *Reniger* v. *Foggassa*, Plowd., 18.)

(*a.*) If the intention of the legislature was to secure work or supplies to the defendants at the lowest rates, by competition, it is evident that the act of 1857 was not intended to apply to lighting the streets with gas, unless the common council should so direct. At that time the whole city was, as it now is, divided into districts, each occupied by a single gas company, and neither having pipes laid in the district of the other.

The act of 1861 (Val. Laws, 480), applies to all contracts made under section 38.

If, therefore, the lighting of the streets in either district is offered to the lowest bidder, the company occupying such district may name its own price, perhaps ten times the value

of the gas consumed, without any risk of competition or unlawful combination, and the contract therefor is at once and absolutely awarded to such company, irrespective of value. This class of cases was clearly not within the mind of the legislature when section 38 was passed.

(*b.*) Section 38 is directory, not prohibitory. (*Cole* v. *Green*, 6 Mann. & Grang., 872.)

IV. All the plaintiffs ask is what the gas actually consumed by the defendants is really worth. No injustice is done the defendants. No demand is made for profits; the *bona fides* of both parties is unquestioned. It cannot be supposed that the legislature expected or intended that the city, by the aid of section 38 of the act of 1857, would or could obtain what was required for public purposes for less than it was worth.

V. The lamps in question were lighted under the superintendence of one of the defendants' officers, the superintendent of lamps and gas, and his acts in the premises were within the scope of his duties, under the charter of 1857 (§ 23). If the gas has been so consumed without the consent of the plaintiff, they could, in a suit against the city, have recovered therefor what it was worth. They are certainly not in a worse position under the facts set forth in this case, for the plaintiffs by the act of 1848, and the consent of the city given thereunder, is prohibited from refusing gas to the city, for the purpose of lighting these lamps; such manifest injustice will not be done by a judicial tribunal, without more explicit legislation to compel such a result. The city has had the benefit of the gas. There is no suggestion of bad faith on the part of the plaintiffs. The defendants should not be permitted to avail themselves of their own alleged disability. (*Clark* v. *Guardians Cuckfield Union*, 21 Law Jour., 349; 16 Jur., 686; *Hills* v. *Gleason*, 11 Wis., 470; *Bigelow* v. *Perth Amboy*, 1 Dutch., 297; *Messenger* v. *Buffalo*, 21 N. Y., 106; *Bissell* v. *Mich. So. & N. I. R. R. Co.*, 22 id., 273.)

PORTER, J. From the facts conceded in the case on which the question is submitted, the law implies a contract

between the parties which it is the duty of the courts to enforce, unless the liability be one of those which the municipal authorities are disabled from incurring in this form, by some statutory prohibition.

It is claimed that this was the case of a contract for *supplies*, to be furnished for a particular purpose, and involving an expenditure of over $250; and that it therefore falls within the inhibition of the amended charter, which prohibits such contracts, unless executed in duplicate by the appropriate heads of departments, in favor of the lowest bidders, on advertisement for sealed proposals. (1 Laws of 1857, p. 886, § 38; Laws of 1853, p. 412, § 12, repealed by § 54 of the act of 1857.)

The contract in question is not within the legitimate scope and intent of these provisions in the amended charter. They were designed to regulate contracts for the performance of work and the purchase of supplies. The gas was manufactured by the company for itself, and not for the corporation. It never became the property of the city by purchase, in the sense applicable to ordinary supplies. The contract, though spoken of in a loose and general sense as one for the sale of gas by the company, was in substance and effect an agreement, that the city authorities should have the privilege of using the property of the plaintiff, for the purpose of lighting the streets and avenues in a particular district, to such an extent as, in the judgment of the common council, the public necessities might require. To extend the provisions of this section of the amended charter to such a case, in disregard of the manifest purpose of the enactment, would involve a departure from the familiar rule, that general words are to be restrained in their application, to the subject matter in reference to which they are employed. (*People* v. *Flagg*, 17 N. Y., 587; *Breasted* v. *The Farmers' Loan Co.*, 4 Seld., 299; *Farmers' Loan & Trust Co.*, 4 Bosw., 89.)

In the present case, an adoption of the construction claimed by the municipal authorities would lead to the absurd conclusion, that the legislature designed to force a provision into the city charter, compelling the corporation to pay whatever

price the sole bidder might choose to exact in his sealed proposals, for the use of property in which he has an absolute monopoly, and in relation to which there can be no competition within the range of legal possibility.

The only remaining question is, whether the written contract between the parties, which expired on the 9th of July, 1859, and which, by its terms, was applicable only to the year then ending, continues to operate *proprio vigore* on all their subsequent contracts, springing from the facts by implication of law. There is nothing in the case to bring it within the exception to the general rule, that an agreement becomes *functus officio* when the purposes for which it was concluded have been accomplished. The contract was not in its nature one running from year to year; and no inference is deducible from the authorities which would warrant the courts in engrafting the rates it prescribed on subsequent contracts between the parties, as in the exceptional cases of a continuing relation, like that of master and servant or landlord and tenant. The defendants are liable for the value of gas they used; and they cannot claim the benefit of an agreement, made when its value was less, and which neither party chose to renew.

Under the internal revenue act, the plaintiff is also entitled to recover the amount of the duties imposed by the government, on the gas consumed by the corporation. Ordinarily, the producer cannot transfer to the consumer his share of the public burdens imposed by law in respect to the profits of his business. But an exception to the general rule was made by act of congress in favor of those engaged in the manufacture of gas. (Statutes at Large, 1864, p. 264, § 94.)

The judgment should be affirmed.

BROWN, J. The Harlem Gaslight Company was incorporated in February, 1855, under the general law for the formation of gaslight companies, and on the 15th of April, thereafter, it obtained from the mayor and common council of the city of New York the right to lay its conductors for conducting gas through the streets, avenues, lanes, &c., of

the city above 79th- street, upon certain conditions expressed
in the resolutions of the common council.of that date. One
of these was that the company should proceed immediately,
or within one year from the time of the adoption of the reso-
lutions, to lay down- their mains in the district embraced in
the grant, and supply, at least within two years from that.
time, gas to be used by the corporate authorities of the city
and private consumers. The mayor and common council also
reserved to themselves the right to revoke the permission grant-
ed by the resolution upon the happening of certain contin-
gencies therein mentioned. The mains or conductors were
laid down and the street lamps erected and gas furnished as
prescribed in the resolution. On the 9th of July, 1858, an
agreement for one year was duly made between the gaslight
company and the city corporation, by which the latter had the
right to order the mains of the company to be extended in and
along all the streets, avenues and public places in the district,
and the company were also required to attach their pipes to
and prepare for lighting the public lamps placed in such
streets by the corporation, and the company were to receive
from the corporation, for gas consumed in such public lamps, the
sum of $28.80 for each lamp, allowing 3,800 hours per annum
for each lamp, and a *pro rata* price for such additional hours
as the same should be kept lighted by direction of the corpo-
ration. No written agreement was made between the parties
since that date, but the common council, since that time, have
ordered public street lamps to be placed by the company in
different parts of the district. The corporation has also
furnished such lamps and paid for their erection, and caused
the same to be lighted, and paid for the gas consumed therein
at the rate specified in the agreement of 1858, in monthly
payments as the bills have been rendered. There is no other
gaslight company having mains or pipes laid in the district
north of 79th street. There are other companies furnishing
gas in the city, but they are confined to particular districts,
and no company or person could enter into competition with
the Harlem Gaslight Company in furnishing the light in
question. From the organization of the company to the

present time, the public lamps within the district have been lighted under the direction of the superintendent of gas lamps, at hours designated by the street commissioners by direction of the common council, which, until September, 1864, has been paid for by the common council upon demand, from time to time, from moneys authorized by the legislature to be raised by taxation. In 1864 like authority was given by the legislature to raise in like manner $430,247, for purchasing, repairing and maintaining public lamps in the city, and the same was raised and appropriated by the common council for that purpose. On the 22d of August, 1864, the company caused to be served upon the corporation a written notice that the company would, on and after the 1st day of September, 1864, charge the city at the rate of $50 per annum for each and every street lamp lighted by the company in that portion of the city north of 79th street. No formal action was taken by the common council upon the subject, but during all the month of September, 1864, the street lamps in the district, 3,129 in number, were lighted as usual under direction of the city authorities. The gas consumed in such lamps for the month mentioned, was 2,884,155 cubic feet, of the value of $13,037.50, at the rate of $50 per annum for each lamp. This sum (which by stipulation is agreed to have been the fair value of the gas at the time it was furnished) the corporation refused to pay upon demand, and therefore the parties submitted the questions arising upon the foregoing facts, in a case made pursuant to section 372 of the Code, to the Superior Court of the city of New York, which rendered judgment for the plaintiff, from which the defendants appealed to this court.

The power and duty of the municipal government to furnish light for the streets and avenues of the city, is not disputed or put in controversy in this action. Indeed it could not be with any show of reason or good sense. In our northern latitudes, when darkness prevails over half the 24 hours for a large part of the year, light diffused through the public streets and avenues is a predominant and urgent necessity which no well governed city can do without. This

beneficent application of artificial light is one of the distin-
guishing characteristics between the city of modern times
and those of the middle ages, when darkness reigned supreme
for no inconsiderable portion of the time, broken only to
become more visible by the occasional torch of the linkboy or
the lantern of the solitary watchman. The modern gaslight,
diffusing its rays over every part of the public thorougfare,
is a source of pleasure and comfort and convenience, as well
as a security against crime and disorder which no other
agency can supply. It is indispensable at all times, and no
municipality can be said to be well governed which is not
able to command its presence under all circumstances. Nor
can it be maintained that a municipal corporation may not
be made liable like a natural person upon an implied assump-
sit, unless the general rule is modified and changed by some
positive legislation. Such corporations are in constant and
daily need of innumerable things which cannot well become
the subject of an express contract, and unless the general
principle for the better security of the city has been restrained
or modified, the corporation must be held liable upon an
implied promise to make adequate remuneration upon a
*quantum meruit* or *quantum valebat*, as the case may be.
The counsel for the defendants concedes all this, but alleges,
in defense of the action, that the general rule before stated
has been modified in its application to the city of New
York by the 38th section of the act of the 14th of April,
1857, to amend the city charter, and the first section of
the act of the 18th April, 1861, in regard to contracts by the
mayor and common council. The first of these declares,
amongst other things, that " whenever any work is necessary
to be done to complete or perfect a particular job, or any
supply is needful for any particular purpose, which job is to
be undertaken or supply furnished for the corporation, and
the several parts of the said work or supply shall together
involve the expenditure of more than $250, the same shall
be by contract under such regulations concerning it, as
shall be established by ordinance of the common council,
unless by a vote of three-fourths of the members elected it

shall be ordered otherwise." And the other provision referred to directs, that "all contracts by or on behalf of the mayor, aldermen and commonalty of the city of New York, shall be awarded to the lowest bidder for the same respectively, with adequate security, and every such contract shall be deemed confirmed in and to such lowest bidder at the time of the opening of the bids, estimates or proposals therefor, and such contract shall be forthwith duly executed in the name of the mayor, aldermen and commonalty by the head of the department having cognizance thereof, with such lowest bidder." Whenever the expenditure is to exceed $250, bids must be invited and competition induced, and the furnishing the labor, supplies and materials are to be awarded to and a written contract entered into with the lowest bidder therefor. If the statutory provisions I have quoted are to have a literal interpretation, and be made to apply to every possible service and supply furnished the city, then the plaintiff cannot recover for the gas furnished, because that article would be included in such a wide and extended construction; and then it would also follow that the corporate authorities have been in the habitual violation of the statutes, with the sanction of the legislature, since the 9th of July, 1859, and exposed to the penalties provided in another section of the act of 1857. (*Brady v. The Mayor, &c.,* 20 N. Y., 312.) The question occurs, however, whether the acts referred to are to have such a construction as to include any possible kind of service, and of property and supplies which the city in its vast and varied operations may need. The purpose of the statutes is to insure economy in the public administration, and honesty, fidelity and good morality in the administrative officers. Competitive offers or bids have no other object but to insure economy and exclude favoritism and corruption in the furnishing of labor, services, property and materials for the uses of the city. This was the purpose and the only purpose of the framers of the statutes, and when they have this effect given to them, nothing further is needed. They are not to have such a construction as to defeat this purpose, to impede the usual and regular progress

of the public business, or to deprive the inhabitants, even temporarily, of those things necessary and indispensable to their subsistence, their health, or the security and protection of their persons or property. Contingencies may arise when services, materials and property, above the prescribed value, may be immediately needed, and where competitive offers and written contracts would be unserviceable or impossible. In such a case the statutes would not apply, because such application could not have been intended. Whenever the nature of the service, or of the property needed for the public uses, or the time within which it must be had to prevent irreparable mischief under competitive offers is impossible, then the provisions of the acts referred to cannot apply, because such could not have been the intention of the law makers, and such emergencies were not amongst the mischiefs which the provisions referred to were designed to correct. The city needs lands in a particular locality for a public market, an engine house or other public building. It requires professional services, those of an engineer, a physician, a lawyer or an artist, or it may require services of any kind, and property to be furnished upon a sudden and unforeseen emergency, of greater value than the $250. If these things can only be obtained through the forms prescribed by the statutes, they cannot be obtained at all, for these things cannot become the subject of a competitive offer to be consummated by a written contract with the person making the most favorable offer. To this effect are the remarks of Judge COMSTOCK, upon the sections of the statutes referred to in the case of the *People v. Flagg* (17 N. Y., 584), and seem to me to be marked by reason and sound sense, and commend themselves as expressing the true construction of the legislative intention. In the case we are considering, the case shows that the plaintiff's mains and conductors were the only things of the kind laid down in the streets of the city north of the center of 79th street, and that there was no other individual company or corporation having the ability and the means to supply the city with illuminating gas to light the streets. Knowing this, the common council,

in granting to the Harlem company the privilege of occupying the streets with their mains, did so upon condition that the latter should supply the streets of the city with gas for street purposes, within two years from the time of the passage of the resolutions. This condition is wholly inconsistent with the idea of competition from several bidders, and the contract awarded to him whose offer was the best for the city. Had the common council, in place of this condition, invited proposals in the usual form, there could have been but a single offer at best, and the provisions of the statutes would have failed of effect because they were not applicable to such a subject. I lay no stress upon the implied sanction given to the transaction between the company and the city corporation for furnishing gas by the legislative appropriations of moneys from year to year, to pay the identical bills in controversy because I think I see a way clear enough to such a construction of the statutes as shall give them all the effect their authors intended, and at the same time save the city from the consequences of applying them to subjects where, from the nature of things, there can be no competition.

The judgment of the Superior Court should be affirmed.

All the judges concurring,

Judgment affirmed.