By the Court. — Neilson, Ch. J.
The appeal by the defendant brings up the question whether the referees erred in ordering the judgment that was entered ; the appeal by the plaintiffs, the question whether the referees should have directed judgment only for an amount equal to the unexpended part of the original appropriation, and if not, the further question whether we have the power to modify the judgment by ordering that it be increased to the sum found due.
We take up, as first in order, the case on the defendant’s appeal.
The legislature had imposed upon the permanent board of water and sewerage commissioners the duty of preparing and submitting to the common council of the city of Brooklyn a plan for furnishing an increased supply of water for the city, including such extension of the present works and the construction of such further reservoirs, conduits and other structures as might be necessary for that purpose, together with an estimate of the probable cost thereof, and directed them to acquire, in the name of the city, the title to such lands, ponds and streams as might be necessary (Laws of 1870, ch. 652).
A plan was prepared, submitted to the common council, and approved.
*23 By another statute the commissioners were directed to carry that plan into effect, and to cause the necessary work to be done. The direction in the former act as to acquiring the necessary lands, &c., was repeated, and authority given to the city to issue bonds (Laws of 1871, ch. 47).
Before proceeding to contract for the work, and upon the advice of the chief engineer, Mr. Adams, the commissioners obtained from contractors estimates and bids for the different kinds of work proposed to be done, but the engineer advised the commissioners not to accept either of the bids, as the price charged for excavation was considered too high. He stated that the bid of Kingsley & Keeney was the lowest of the five estimates received, and that, if they would reduce the charge for excavation to fifty-five cents per cubic yard, the contract should be given to them; that their bid would then be $44,675 lower than that of either of-the other parties, and in that statement and recommendation, Mr. Kirkwood, the other engineer, concurred. The proposed reduction having been assented to, the agreement under which these plaintiffs have performed work and furnished materials, as found by the referees, was executed, under date of January 9, 1872.
The first question is as to the validity of that agreement.
There was no call for bids with a view to public competition, nor need there have been. A board of commissioners charged with the duty of contracting could do so as at the common law, save when expressly directed and restrained (Hobert v. City of Detroit, 17 Mich. 246; Miller v. City of Milwaukee, 14 Wis. 642).* *24 From the course of legislation with us, it appears that this board, in letting out work of this class, was under no prescription as to inviting competition. It is to be further observed that the acts of 1870 and 1871, before referred to, left the commissioners to contract, with such observances, and in such forms, as might be found expedient. That, in such a case, competing contractors need not be called in, was determined in Greene v. Mayor, &c. of New York (60 N. Y. 303). This view disposes of one element of the objection that changes were made in the specifications after the several proposals had been put in, and before the contract was signed. In the absence of fraud it is not, in a legal sense, material whether all the proposing contractors saw the specifications, as modified, or not. As the commissioners could legally enter into the contract *25 without calling in competitors, they could do so without recalling them.
The charges of fraud, collusion, conspiracy and favoritism set up in the answer to impeach the contract and what was done under it, appear to have been duly considered by the referees. In their opinion they discuss the matter, and in their report find that there was no proof to support those charges. I have carefully gone over and analyzed the testimony and the papers in these appeal books, and sought to apprehend the force, effect and relation of the circumstances, and am satisfied that the referees were correct in the conclusion stated by them.
As the city could not, in the exercise of its inherent and implied powers, pledge its credit in acquiring and improving lands outside of the city limits, the legislative direction given was to be respected ; this contract so framed as to carry out substantially the purpose of the legislature. It was as the case of an agent acting on the instructions of a principal. As suggested by one of my brethren on the argument, a corporate authority to expend $1,400,000 would not support an agreement to pay $2,000,000, and the parties acting were bound to know the terms of the statute. In this point of view, it is material that the probable expense of the work, as estimated and reported by the engineer, including the cost of 300 acres of land at Hempstead, was $1,393,743, and that the work was let to the plaintiffs for a less sum. It further appears that, with the damages assessed and paid for the additional land, the whole expenditure, as proposed, was within the limit of $1,400,000. We have no means, nor had the referees, of revising those estimates, no evidence tending to show that the parties had reason to doubt their correctness.
As the arrangement for the work did not involve the exercise of power greater than had been conferred *26 on the city, the contract was valid and could have been enforced.
The questions raised on the argument relate to what was done under the contract as well as to the contract itself. The learned counsel for the defendant claim that the plan approved by the common council, July 11,1870, should have been adhered to strictly ; that departures from and extensions of it were without authority. The land area in that plan having been fixed at 300 acres, it is not easy to reconcile the restrictive policy now suggested with the authority given by the act of 1871 to acquire, in the name of the city, the title to such lands, streams and ponds as might be necessary. Nor can we reconcile that policy with the extension of that land area from the 300 acres thus stated, to more than 500, including the so-called Nichols pond, now a part of the reservoir. The city acquired and paid for the increased quantity of land, and in resisting in the supreme court the plaintiffs’ application for an injunction, and in showing cause for a mandamus against the water board, prevailed by alleging that the title to the land had been duly acquired, and claiming the consequent right of possession. It is quite apparent that yet more land might have been taken under the act of 1871, had that been necessary. It would seem, therefore, that neither the legislature nor the city intended to adhere very closely to the plan of July, 1870. The extension of the land and of the water area may not have been of equal necessity or importance,- but the power and the election to do either deserve attention in considering the claim now presented on behalf of the defendants. That claim, if sound and enforced, would disaffirm the title of the city to the land except the 300 acres, as well as prevent a recovery for work done thereon, and would justify the reclamation of the money paid for what is now alleged to be an excess of labor and an excess of land.
*27 The argument in support of a theory apparently so inconsistent and inequitable depends upon the sense in which the word “plan” is to be taken, upon the terms of the contract, upon the necessity there may have been for the changes and extensions made, and upon the relation of the city to the property and to the persons in charge of and directing the work.
It appears, from the proofs in the case, that several methods for securing an increased supply of water for the city had been proposed prior to the legislation to which we have referred. That of a storage reservoir was finally approved. That was the plan which the act of 1871 directed to be carried out, and the word plan, thus used, distinguishes this method from the other projects which had been suggested. The legislature intended that the title to the necessary land, 300 acres or more, should be acquired, that the Hempstead reservoir should hold one thousand' million gallons of water, .and taking the statute as it reads, cost not to exceed fourteen hundred thousand dollars. Of the mere details of the work and materials, how much of each and how applied, — matters depending upon practical skill and experience, — the legislature could not well have taken cognizance.
We might agree with the learned counsel for the defendant, if it were material, that a municipal corporation cannot be held on an implied undertaking. ' But here was an express agreement, So, too, if we overlook cases like the Harlem Gaslight Co. v. Mayor, &c. of New York, 33 N. Y. 309, and Muller v. The same, 63 Id. 353, we might agree that “the principle of quantum meruit cannot be applied.” But the prices for this work' were fixed, and the method of fixing the prices of extra work, if any, prescribed. So also, we accept the definition of the word “specification” as given on the argument. But the criticism is of no moment. The paper called a specification had *28 been accepted by the board of city works, and by the common council, and incorporated in the contract. In it, the right to make changes was reserved to the city, and of new and substituted work there could have been no specific account or enumeration. There can be no doubt as to the legality of such a reservation, and of the plaintiffs’ covenant to carry out the work as directed. It was stipulating in the manner often found expedient between individual contractors. But it does not appear, from the proofs, that the changes in the work were made at the instance or by the procurement of the plaintiffs, and such is the finding of the referees.
According to the thirteenth section of the specifications, the dam at the southern end of the reservoir was to be placed on such ground as the engineer should direct. It was placed about 200 feet further south than had been at first contemplated. That added to the space within the reservoir, but not to the expense of construction. The same section provides for an intermediate dam, “ should such division dam be considered necessary.” It was not found to be necessary, and was abandoned, thus avoiding an expense of from $230,000 to $240,000, and, as the referees find, without prejudice to the reservoir. It was well that the questions as to the location of one dam and the building of the other were held for mature consideration. But had it been otherwise, the objections that dispensing with a useless dam, and removing the other to a better site than that first selected, were departures from the plan, would not be entitled to much respect.
The propriety, and, in an undertaking of this extended character, the necessity of reserving the right to make changes in the construction and work clearly appear in relation to the dam at the Nichols pond. That dam was to have been the northern boundary of the reservoir. It gave way, was repaired, gave way *29 again, and was found to have no stability whatever. In his testimony, Mr. Probasco, the resident engineer, describes its rickety condition. It was liable to be swept into the reservoir by freshets. A deposit of “black muck” found in the pond, impure, if not poisonous, would also be swept into the reservoir. Thus it was that Nichols’ pond, by its own force and condition rather than by the election of the commissioners and of the engineers, became a part of the reservoir, and the excavations made by the plaintiffs, in obedience to the directions given and to the terms of their covenant, were necessary, if not unavoidable. That work was a mere incident to the construction of the reservoir, as much so as the removal of a landslide would be to that of a canal. It was fairly within the statute which directed that the necessary work should be done, and it would be a reproach to the law if the stipulated compensation could be withheld.
One of the most delicate, if not difficult questions arising in the course of the work had relation to the height of the new dam, and, of necessity, to that of the water to be held by it. In what is called the plan, the flow line, representing the surface of the water, the reservoir being full, was put at thirty-two feet above the tide. Many citizens, including Mayor Kalbfleisch, were apprehensive that the dam, built at the height required by that flow line, would not be safe. So, after much consideration by the engineers, the line was lowered from thirty-two to twenty-nine, the dam to be conformed to that reduction. The consequences were an increased amount of excavation at great expense, the saving of the cost of building a portion of the dam three feet high and fourteen hundred feet long,' the contributions of water from the springs reached by the deeper excavations, and the unquestioned benefit of a dam safer and more durable than it would otherwise have been.
*30 The learned counsel for the defendants claim that the flow line was thus lowered three feet without authority, and that there should be no recovery for the extra excavations. We cannot accept that view. The general authority to make changes in the work would have been sufficient, but the thirteenth section of the specifications expressly provided that the dam should be constructed “in every way in accordance with his (the engineer’s) instructions,” and it is apparent that, to lower the dam at all, involved the necessity of having the flow line, or the surface of the water, lowered to the same extent. Then, too, that question was one which the engineer only could understand and properly determine.
All the changes made in the work have been fully stated and considered by the referees. After careful deliberation, we agree with them that “the chief engineer deemed each and every one of those changes to be necessary and proper, and in directing them to be made, he acted in good faith ; and none of the changes were directed or made with the intention of increasing the profits of the plaintiff's, or for the purpose of benefiting them in any manner;” that “the additions, omissions and changes did not, nor did either of them, change the substantial plan for furnishing an increased supply of water for the city of Brooklyn, adopted by the common council,” and that “none of the changes made by Colonel Adams, which the plaintiffs carried out under his direction, were outside of the plan authorized by the common council in such a sense as to defeat the plaintiff’s right to recover.”
We have had occasion to say that the contract was valid and could have been enforced. The case of Clark v. Mayor, &c. of New York, 4 N. Y. 338, would suffice to show that agreements in such form are not regarded with disfavor. It was there held that, in a contract as to a section of the Croton aque *31 duct, a public work, tlie right to make alterations in the form and dimensions of it could be reserved, and that the contractors were bound to carry out such changes, and might recover for the work done. In that case, as in this, the work had been stopped by the commissioners before its completion (See also, Slusser v. City of Burlington, 42 Iowa, 378, and Harrington v. Mayor of New York, 10 Hun, 248).
These plaintiffs were at work on the dam when they were directed to quit: in the expressive language of the referees, “were driven from it.” That order, which plaintiffs were bound to obey, as the city had the right to take possession of its property, was given under the erroneous impression that the money appropriated for the work had been exhausted. It would seem that the dam had been nearly completed. We take extracts, as to the state of the excavation and of the dam, from the deposition of Mayor Schroeder used before the supreme court, and, as matter of record, before the referees. Thus he says, “Thatsuch excavation is complete to the extent requisite to the holding of 1,000,000,000 of gallons of water, but the stone wall or dam has been erected to the height of only twelve feet,” . . . “ and all that is necessary in order to attain the object for which the said reservoir was constructed, and to develop its full efficiency, is to complete said stone wall or dam, which can be done at a cost not exceeding $20,000.” General Slocum, president of the board of city works, gave a like estimate of the cost. They were both speaking, no doubt, with reference to the reduced prices of labor in the market. In the contract which they afterward gave to Brady, he undertook to finish the dam, build the gate-house and other necessary works connected with the dam, for $22,799.60. At the time the plaintiff’s work was stopped there was more than $57,000 of the appropriation In the treasury, and other sums had been misapplied. *32 * It thus appears that at the prices fixed for the work by the contract, the money remaining for use was more than sufficient to have paid for completing the dam, and that, even on the theory that the expenditure should not exceed the appropriation, the defendant put an end to the contract without cause; in other words, elected to make default.†
We are disposed to hold firmly to the distinction which exists between municipal and other corporations in respect to inferences or imputations of assent, adoption, ratification, and the like. But there are certain rules of conduct, principles so equitable as to command almost universal respect, worthy of observance by a municipal government. In contracting for, and *33 carrying on the improvement in question, the corporate authority of the city was vested in the common council and the permanent board of water and sewerage commissioners. But, during the preparation for and the progress of this work, in the order of official succession, three distinguished citizens, neither of them wanting in experience or in zealous attention to public affairs, represented the city in its highest department. Moreover, the persons appointed to have supervision of this work, and whose directions the contractors were bound to follow — several competent engineers — were the agents of the city, and there never had been a time when the city, owning the land, could not have taken more immediate charge of the work with the same right as on the day when the contractors were dismissed. If the work imposed by the enforced inclusion of the Nichols pond was not to be paid for it would have been fair and seemly to intervene at an early day. The city could not, indeed, be estopped by its silent acquiescence, as the citizen might be, but there is a strong equity in favor of making compensation for work performed, as the referees find, in good faith, in pursuance of the agreement and of the exactions of the defendant’s agents.
The referees state that there was substantially no dispute before them as to the performance of the work and the furnishing of the materials, as claimed in the plaintiffs’ bill of particulars. On the argument before us one of the learned counsel for the defendant made a like statement, with the suggestion that, for that reason, a compulsory reference should not have been ordered. It is well known that the application to refer would not have been granted if it could have been foreseen that the case would be thus tried on the mere questions as to the liability of the defendant, or if a stipulation, admitting the account as stated, but reserving the other questions, had been filed. But the *34 court was constrained to send the case to the referees, as the account for work and materials, and the amount thereof, were put in issue by the pleadings (See opinion thereon in 1 Abb. New Cas. 108).
The referees find that there remains unpaid to the plaintiffs on account of the work, after the deduction of payments, the sum of $167,799.77, irrespective of interest. That is a finding of fact, and cannot be regarded as against the weight of evidence. It was strictly in accord with the proofs, and we have no power to reverse it. It must, therefore, stand.
I am of opinion that, the referees were correct in stating the account of sums which were to be regarded as misapplied, and in the restorations thus made to the fund. They regarded that fund, the $1,400,000, as the limit of the appropriation for this work, and found, as a necessary result, that the judgment in this action could only be entered for the balance thereof remaining unapplied, with interest. The defendant prevails thus far, and that determination, in a strictly legal sense, was correct. We concur with the referees and with the defendant’s counsel in their construction of the act of 1871 in respect to the limit of the appropriation. Whatever ground of complaint the plaintiffs may have, regarding the amount of the judgment as inadequate, the defendant has no legal cause to complain. It cannot be said that the contract was ultra vires, as if it provided for an expenditure greater than the appropriation.* If the limited amount of the judgment *35 is not an answer to that objection, it cannot be said that the parties intended to evade the statutory limitation, or that the value of the entire work could have been anticipated. The mere circumstance that the account, as finally stated, exceeded the appropriation, does not tend to vitiate the agreement. The claim of the plaintiffs is not to be defeated because they did not complete the reservoir, if they were bound to do so, as they were ordered to desist. As between individual contractors, the builder would confessedly recover for his work up to that point; perhaps, also, for profits he might have made. The only distinction between the claim of these plaintiffs and of individual contractors, in such a case, is that the recovery here is limited to what remained of the appropriation.
I am of opinion that the act of 1875 (L. 1875, ch. 258), which authorized the city to issue its bonds to the amount of $500,000 for the completion of the reservoir, was a ratification of the prosecution of the work.* The legislature recognized the existence of the reservoir in its unfinished condition, and made provision for its completion.† This proposition is not affected by the fact that the bonds were not issued or the duty to issue them imposed in absolute terms.
The questions as to the supposed obligation of the plaintiffs to return money received, and as to the effect of voluntary payments, need not be considered.
After a careful examination we think that none of the exceptions were well taken.
As to the appeal of the plaintiffs, we have only to say that the provision of the code giving an appellate court power to reverse, affirm or modify a judgment appealed from, involves a limitation and does not au *36 thorize the increase of the judgment. We are of opinion that the power of an appellate court, as it had previously existed, has been restricted and qualified by that statute. The question is of great moment, and we do not feel at liberty to give the statute the construction claimed in support of this appeal. The judgment and order appealed from must be affirmed with costs.
McCue, J., concurred.

 In Miller v. Milwaukee (14 Wisc. 643, [1861]), opinion by Dixon, Ch. J., it was held that the general powers possessed by municipal corporations at common law, these words occurring in the defendants’ *24 charter, was sufficient to authorize it to contract to build a breakwater to preserve certain streets from being destroyed by the action of the waters of the lake. — Dixon, J., says :
“We are of opinion that the counselors and aldermen possess the power, and that it was rightly exercised. Municipal corporations are instituted for the advancement and regulation of trade, the local administration of justice, and the better government of their particular vicinities. And for these purposes they are by the common law invested with the power of making- ordinances and by-laws. Willcock on Mun. Corp. 16 (12 Law Library, 10). They may also elect, govern, and remove their members, and regulate their franchises and property. Id. 298 (12 Law Library, 164). They possess power to lay out, open and repair streets and highways, to establish companies to protect the property of the citizens from destruction by fire, and to levy taxes to defray the expenses.”
In Sturtevant v. Alton, 3 McLean, 393 (1844, opinion by McLean, J.), — Held, that a municipal corporation having power to grade streets, has necessarily power to make contracts respecting the same and every incidental power necessary thereto.
In Rome v. Cabot, 28 Geo. 50 (1859, opinion by Lumkin, J.),— Held, that the construction of water-works is within the general power conferred on a municipal corporation to make all contracts which they deem necessary for the welfare of the city.

 Where, under the provisions of a city charter, a contractor is only payable out of a particular fund, the city will be liable to him if that fund is misappropriated by the common council. Lansing v. Van Gorder, 24 Mich. 456. And see 6 Id. 51.
A warrant for the payment of a sum named, “out of money in the treasury not otherwise appropriated,” — Held, to mean that the payment should be made out of money not appropriated to special purposes, and that the creditor need not show that there was money in the treasury, before suing, as the county was liable, whether there was any there or not. Campbell v. Polk, 3 Iowa, 467.
Where money belonging to the drainage fund of a town has been paid to the treasurer thereof it continues to be in the town treasury in contemplation of law until legally paid out therefrom; and the fact that the supervisors had used it, without legal authority, for another purpose, before entering into a contract for drainage, will not relieve the town from liability on such contract. Holil *. Westford, 83 Wis. 334.

 Where a contractor to erect a public building, after the dismission of the committee through whom the contract was made, and a rescission of the order appointing it, and notice by the justices not to go on with the building, still continued to act under such committee, and, by its direction, made material departures from the specifications of the contract, — Held, that lie forfeited his right to recover the price agreed on in the contract. McCoy v. Harnett, 8 Jones (N. C.) L. 272.

 Other cases heretofore referred to, it will be seen, do not sustain the view that a municipal contract is void as ultra vires, because it requires more money than had been appropriated; and this could not be justly sustained because the contractor would then be liable to repay everything that he had received from the beginning; if there be a prohibition on exceeding a certain entire cost, the contract may be ultra vires as to the excess. See also Jackson County v. Hall, 53 Ill. 440.

 To same effect, Hasbrouck v. Milwaukee, 21 Wisc. 217, 235.

 As to uncompleted work, see Penn Township v. Perry Co., 78 Penn. St. 457.