John J. Snyder et al., Plaintiffs, v. John F. Hylan, as Mayor of The City of New York, A. B. McStay, as Commissioner of Street Cleaning of The City of New York, Charles L. Craig, as Comptroller of The City of New York, and The City of New York, Defendants.

(Supreme Court, Kings Trial Term, November, 1918.)

Injunctions — taxpayer's action to restrain contract for removal of garbage — when motion to make injunction permanent denied — nuisance — Greater New York Charter, § 541.

Where, in a taxpayer's action to restrain the carrying out of a certain contract for the removal, at the rate of $1,000 a day, of the garbage of the city of New York, made, without competitive bidding, by the commissioner of street cleaning under section 541 of the Greater New York Charter, it appears that a corporation with which the city had a contract for the removal of its garbage, was by a peremptory order of the board of health directed to abate the nuisance caused by its method of conducting its plant, whereupon the receivers of the corporation suspended all operations and refused to receive any more garbage from the city, and it further appears that said commissioner in the making of the contract now in question, and acting as he was in the emergency, committed no illegal act, both the charge of the illegality of said contract and the charge of the waste of public funds, fall.

Where the moving papers show a case of threatened, expected or contingent danger and not an actual one, and there is an absence of proof that plaintiff has sustained special damage by reason of an alleged threatened nuisance by the operation of the contracting company's plant, a motion to make permanent an injunction granted in the action will be denied and a stay granted by the order to show cause herein will be vacated and set aside.

Taxpayer's action to restrain the city of New York from proceeding further to carry out the provisions of

a certain contract between the street cleaning commissioner and the New York Sanitary Utilization Company.

William Liebermann, R. Percy Chittenden, for plaintiff.

William P. Burr, corporation counsel (John F. Collins, J. A. Storer, of counsel), for defendants.

MANNING, J.   The plaintiff, a resident of and a taxpayer in the borough of Brooklyn, brings this action to restrain the city officials, to wit, the mayor, comptroller and the commissioner of street cleaning of the city of New York, from proceeding further to carry out the provisions of a certain contract or agreement entered into between the street cleaning commissioner and the New York Sanitary Utilization Company on or about the 19th day of October, 1918.   The " contract " complained of is evidenced by a certain letter signed by the commissioner, and is as follows:

" CITY OF NEW YORK
" DEPARTMENT OF STREET CLEANING.
" *October* 19, 1918.
" NEW YORK SANITARY UTILIZATION Co.,
 " 190 Montague Street, Brooklyn:
" GENTLEMEN.— Receipt is acknowledged of your letter dated October 5, 1918, confirming your oral offer to dispose of the City's garbage at Barren Island.
" This is to inform you that your offer is hereby accepted, upon the following terms and conditions, however:
"(1) Beginning at a date to be set by you, which shall be as soon as it is possible to resume operations at your plant on Barren Island, you are to provide

the necessary scows, equipment and labor for the reception, at the City garbage dumps in the Boroughs of Manhattan, Bronx and Brooklyn, of all garbage collected by the carts and vehicles belonging to the Department of Street Cleaning, as well as all the garbage delivered at said dumps by private carts and vehicles authorized by the said department to use the same, and you are to remove and finally dispose of such garbage at your plant on Barren Island. ·

"(2) The City does not agree to deliver any specific amount of garbage, or garbage from any particular source or sources, but will deliver all the garbage which shall be collected by its carts from any source. It does not agree to regulate or control the owners of private vehicles who are authorized to use the dumps, which use is entirely optional with them. It does not undertake or agree to compel the owners of any business, trade, manufacturing establishment or hotel or building, to deliver any garbage to you or to this department.

"(3) You are to furnish all the labor necessary to trim, and load vessels used for the removal of garbage, as well as the captains or custodians employed upon said vessels.

"(4) You are to furnish all the labor, appliances and tow-boats necessary to handle, wind and shift said scows at the dumps, either for the purpose of loading the same or transferring the same to or from underneath the dumping boards.

"(5) You are to furnish all the tow-boats necessary to tow said vessels from the dumps to Barren Island and return.

"(6) You are to furnish sufficient scows to keep the dumps covered at all times, so that dumping may be carried on uninterruptedly by department and private carts.

" (7) No materials picked or reclaimed from the garbage, after it is deposited upon your vessels, shall be stored upon or beneath the dumping board or any part of the dock upon which it stands.

"(8) No claim shall be made by you against the city for any bones, fat or other garbage which may be mixed by householders with ashes and rubbish transported to the dumps maintained by the City for the disposal of the same.

" (9) This agreement shall continue from day to day until further notice and may be discontinued at any time by either party upon giving three days' notice to the other party in writing: but in no event shall it be terminated by either party prior to January 1, 1919.

" (10) The City will furnish all of the dumps to be used under this agreement, and which are at present located as follows:

| | |
|---|---|
| " *Borough of Manhattan.* | Jackson Street. |
| | East 46th Street. |
| | East 107th Street. |
| | East 139th Street. |
| | Canal Street, N. R. |
| | West 47th Street. |
| | West 79th Street. |
| " *Borough of The Bronx.* | 138th Street. |
| " *Borough of Brooklyn.* | Sixth Street. |
| | Washington Avenue. |
| | Coney Island. |

" (11) The City shall have the right, at any time, to change the location of any of these dumps or to cause the same to be temporarily closed for the purpose of repairs or dredging, or to substitute others in their places.

" (12) The City agrees to pay for the removal of said garbage at the rate of One Thousand Dollars

6

($1,000.00) per day for each and every day during the period of this agreement, Sundays and holidays included.

" (13) At the termination of each month during the continuance of this agreement, you shall submit a bill in quadruplicate for the services rendered during the current month and said bill will be paid in accordance with the rules of the Finance Department.

" (14) The said amount shall cover the entire work to be performed by you under this agreement and no claim shall be made for any additional compensation, for any reason.

" (15) During the interim between the time of making this agreement and the time fixed by you for taking over all the garbage, should the City decide to use deck scows for the disposal of garbage, you are to unload the same at your plant at Barren Island for the sum of Four Hundred Dollars ($400.) per scow of a size not exceeding 90′ x 30′ and about three hundred (300) tons capacity. Scows of a larger capacity to be paid for at the same ratio. The City to furnish and tow all such scows to your plant at its own expense and remove them therefrom.

" (16) The acceptance of this offer of Four Hundred Dollars ($400.) per scow, is understood to be entirely optional with the City and not binding upon it in any way. . The City is to be free to dispose of its garbage as it sees fit until notice is received from you of your readiness to remove and dispose of the entire daily out-put of garbage at all of the dumps.

" Yours truly,
"(signed) A. B. MACSTAY,
" *Commissioner.*"

It appears that on or about April 10, 1916, and of course long prior to the happening of the contingency

which occasioned the writing of the letter just set forth, the city had made and entered into a contract with a concern known as Gaffney, Gahagan & Van Etten for the final disposition of garbage for the period of five years from the 2d day of January, 1917. This contract was afterwards assigned by the concern last mentioned to a corporation known as the Metropolitan By-Products Company, Inc. Under the terms of that contract the city was to receive certain stipulated amounts each year for the garbage, and the contract contained a further provision that the plant for the disposition of such garbage should not be located wthin the boundary of the borough of Manhattan nor within the confines of Jamaica bay. The contractor in 1916 started to erect a garbage disposal plant at a place called Lake Island, Staten Island, in the borough of Richmond, and was immediately confronted with violent opposition by the residents of Staten Island, who protested against the erection of such a plant in their borough, and such proceedings were subsequently had that action was taken by the state commissioner of health who made an unfavorable report as to the operation about to be carried on by the contractor. This report was confirmed by the governor on January 25, 1917. It appears that in the early part of January, 1917, when the company should have begun operations under the contract, its plant on Staten Island was incomplete, meanwhile they had disposed of the garbage at a plant on Barren Island. Later in the same year they did use the Staten Island plant, and this condition continued until December, 1917, when in an action brought in the United States District Court for the Eastern District of New York receivers were appointed for the company. Meanwhile there had been paid to the city by the company $120,000 and payments were made in the year

1918 at the rate of $12,500 per month, until June of that year, since which time no further payments have been made. It appears that in May, 1918, the department of health received many complaints as to the noxious and offensive odors emanating from the Staten Island plant, from the garbage en route to the plant and from the garbage at various water fronts in the city of New York. Complaints were also made to the street cleaning commissioner, and the district attorney of Richmond county. The grand jury of the county of Richmond indicted the superintendent of the plant for maintaining a nuisance, and on or about the 25th of May, 1918, the board of health ordered the company to make certain improvements so as to abate the nuisance complained of. Under date of July 23, 1918, the commissioner of street cleaning caused to be served upon the receivers of the corporation a detailed statement of acts and omissions on the part of the corporation, and stated in terms that unless the conditions were improved and the terms of the city contract more fully complied with he would cancel the contract. Nothing was done by the receivers, and in fact they notified the commissioner they would be compelled to close down the plant unless the city assisted them in a financial way, and the city did help the receivers to the extent of loaning the company $26,500 for which receivers' certificates were issued. The matter was again taken up by the board of health, and in September, 1918, a peremptory order was served upon the company directing it to abate the nuisance caused by its method of conducting its operations, and finally on or about the 2d of October, 1918, the receivers suspended all operations and refused to receive any more garbage from the city. Since that time the city has been endeavoring to dispose of the garbage itself by dumping the same out at sea, and it appears that the

cost to the city of doing this work, since the breach of
the contract by the receivers, is $1,800 per day, and
this too is only an initial charge, and does not cover
any extra or incidental expenses which are bound to be
incurred. The only plants in existence appear to be
the one at Staten Island and a plant owned or con-
trolled by the New York Sanitary Utilization Com-
pany located at Barren Island, and the city itself it
appears never had nor does it now possess any proper
facilities in the way of scows or sea dumpers for the
proper disposal of garbage. Being confronted with
this emergency the commissioner of street cleaning
of the city of New York claims that he was fully justi-
fied in making the contract or agreement complained
of, and he says that it was the best and only arrange-
ment that he could make. He claims that the agree-
ment in question is but a temporary hiring or arrange-
ment, which by the terms of the agreement in question
can be terminated by either party after January 1,
1919, upon a three days' notice, and he justifies the pro-
longation of the agreement until January 1, 1919, by
the assertion that he could not induce the new con-
tractor to take charge of the garbage unless the agree-
ment provided that it should last at least until the
1st day of January, 1919, and this because of the
moneys which the new contractor stated would have
to be expended in order to properly dispose of the
garbage in question. The foregoing recital does not
pretend to state in detail the various steps and pro-
ceedings taken by the city authorities, health boards,
citizens committees, grand juries and state officials
concerning this matter of garbage disposal, but rather
in a brief way attempts to picture the situation in
which the commissioner says he found himself in the
month of October when the receivers of the Staten
Island plant declined to proceed further with the con-

tract, and he justifies his action entirely upon the ground that he acted for the public good in a great emergency and that he has complete authority for his act by section 541 of the charter of the greater city of New York. This section reads as follows:

" The said commissioner of street cleaning shall have power, and it shall be his duty, to purchase or hire from time to time for his use as such commissioner, at current prices, such and so many horses, carts, steam tugs, scows, boats, vessels, machines, tools and other property as may be required for the economical and effectual performance of his aforesaid duty or to contract for the construction of any such tugs, scows, boats, vessels, carts, machines, tools or other property; or for the sweeping, cleaning, sanding, sprinkling and flushing or washing of streets and the removal of street sweepings, and also to contract for the cremation, utilization or burning of street sweepings, refuse and garbage; or for the melting or removal of snow upon or from any streets or avenues or parts thereof. The title to property so purchased or constructed shall be in The City of New York. All such hiring, or purchases, or contracts, however, exceeding one thousand dollars in amount at any one hiring or purchase, shall be let by contract to the lowest bidder therefor, founded on sealed bids or proposals made in compliance with public notice advertised in the City Record; such notice to be published at least ten days prior to the opening of such proposals or bids. Provided, that nothing herein contained shall prevent said commissioner, whenever it shall be necessary, to hire such horses, carts, boats, steam tugs, scows, vessels, machines or tools for a day or trip, and for successive days or trips, without advertising of contract founded on sealed proposals or bids, at compensation by the day or

trip, notwithstanding the aggregate compensation for such successive days or trips may exceed said sum of one thousand dollars. The said commissioner is hereby authorized, whenever and as often as, in his opinion, the public interests shall require, to reject all bids or proposals received in answer to any such advertisement, and to re-advertise for bids and proposals as hereinafter provided.''

It will be observed from a reading of the chapter just quoted that it is therein provided: ''that nothing herein contained shall prevent said commissioner, whenever it shall be necessary, to hire such horses, carts, boats, steam tugs, scows, vessels, machines or tools for a day or trip, and for successive days or trips, without advertising of contract founded on sealed proposals or bids, at compensation by the day or trip, notwithstanding the aggregate compensation for such successive days or trips may exceed said sum of one thousand dollars.''

It is the contention of the plaintiff that under the clause of the section just quoted the commissioner was without power to make the contract complained of and that all he could do was to hire the paraphernalia specified in the charter. I cannot agree with the contention, for it seems to me that that would be too narrow a construction to place upon the statute in question. The legal principles covering the construction of statutes similar to the one under discussion is very aptly stated by Brown, J., in the case of *Harlem Gaslight Co.* v. *City of New York,* 33 N. Y. 309, where at page 329 the court says: '' The question occurs, however, whether the acts referred to are to have such a construction as to include any possible kind of service, and of property and supplies, which the city, in its vast and varied operations, may need. The purpose of the statutes is to insure economy

in the public administration, and honesty, fidelity and good morality in the administrative officers. Competitive offers or bids have no other object but to insure economy and exclude favoritism and corruption in the furnishing of labor, services, property and materials for the uses of the city. This was the purpose and the only purpose of the framers of the statutes, and when they have this effect given to them, nothing further is needed. They are not to have such a construction as to defeat this purpose, to impede the usual and regular progress of the public business, or to deprive the inhabitants, even temporarily, of those things necessary and indispensable to their subsistence, their health, or the security and protection of their persons or property. Contingencies may arise, when services, materials and property, above the prescribed value, may be immediately needed, and where competitive offers and written contracts would be unserviceable or impossible. In such a case, the statutes would not apply, because such application could not have been intended. Whenever the nature of the service, or of the property needed for the public uses, or the time within which it must be had to prevent irreparable mischief, under competitive offers is impossible, then the provisions of the acts referred to cannot apply, because such could not have been the intention of the lawmakers, and such emergencies were not amongst the mischiefs which the provisions referred to were designed to correct. The city needs lands in a particular locality for a public market, an engine-house or other public building. It requires professional services, those of an engineer, a physician, a lawyer or an artist, or it may require services of any kind, and property to be furnished upon a sudden and unforeseen emergency, of greater value than the $250. If these things can only be

obtained through the forms prescribed by the statutes, they cannot be obtained at all, for these things cannot become the subject of a competitive offer, to be consummated by a written contract with the person making the most favorable offer.''

To the same effect see the opinion of the court, per Allen, J., in *Matter of Dugro,* 50 N. Y. 513, and where the court at page 517 says: ''A thing within the letter is not within the statute, unless within the intention. The act of 1870 can have full effect in cases to which it can be applied, but if there are cases to which it could not be reasonably applied, they are not within the intention, and therefore not within the statute. It seems to be absurd to say that all powers and all authority is by necessary implication taken from the municipal authorities except such as can be exercised in strict conformity to this one provision of law — that this section of the law of 1870 is to be the touch-stone to determine the limit and extent of the powers vested in the common council, and that all other acts must conform to it. It should rather be interpreted with respect to the other statutes to which it is ancillary.''

To the same effect see *Gleason* v. *Dalton,* 28 App. Div. 558, 559, where the court, per Hatch, J., says: '' ' The object of the provision in the charter is to secure the advantages of competitive offers for the work to be done, or the supplies to be furnished; and when the supply, as in this case, is one involving scientific results attained by mental and corporeal labor, the advantage cannot spring out of mere bids, but of tests to which the thing offered shall be subjected.' * * * The general rule which seems now to have been pretty firmly settled regarding the construction of this language, is that where the subject-matter of the contract is such that competitive pro-

posals work an incongruity and are unavailing as affecting the final result, or where they do not produce any advantage, but the nature of the supply requires that it be determined from inspection and test, which are made up from present examination and trial and depend upon special knowledge and judgment, or where the thing to be obtained is a monopoly, or the requirement is of personal skill or professional service, or it is practically impossible to obtain what is required and observe such form, the language of the statute does not apply, and the particular case falls within the exception.''

See also the case of *Brooklyn Alcatraz Asphalt Co.* v. *City of New York,* decided January 26, 1905, by Mr. Justice Kelly, wherein he said: '' But it cannot be that officials in charge of the city departments are absolutely powerless to act without advertisement and competitive bidding, no matter what the emergency may be. Such is not the intention of the legislature (*Brady* v. *City of New York,* 112 N. Y. 480; *North River Elec. Light & Power Co.* v. *City of New York,* 48 App. Div. 14.) ''

See also *Staten Island Water Supply Co.* v. *City of New York,* 144 App. Div. 318.

Applying this rule of construction to the section of the charter in question, I am forced to the conclusion that the commissioner in making the contract in question and acting as he was in the emergency which has been described did not commit an illegal act, and, hence, the charge of illegality must fail, and if this reasoning be correct, then perforce the charge of waste must also fall. Regarding the contention of the plaintiff that the act of the commissioner seeks to revive a public nuisance on Barren Island, found to be such, and a detriment to public health, I may say that

the complaint itself, and the affidavit annexed thereto fail to support the charge.

Regarding that phase of the plaintiff's complaint in the supporting affidavits which seek to sustain the charge that the disposal of garbage at Barren Island will constitute a nuisance, it is sufficient to say that the assertions are not supported by competent allegations or proof. The mere fact that the plant at Barren Island will necessarily cause a public nuisance or will revive a public nuisance can be disregarded. The alleged danger as was said by Judge Finch in the case of *Morgan* v. *City of Binghamton,* 102 N. Y. 503, which can alone support this injunction '' is in the air of an uncertain and indefinite future. Its possible coming rests upon opinion and speculation. It is both doubtful and remote. Experience only can test the question satisfactorily.''

This is the situation in the instant case where the moving papers show that it is a case of threatened, expected or contingent danger, and not upon an actual one. The plaintiff in the instant case gives no proof whatsoever of any special damage sustained by him by reason of the threatened nuisance, and is therefore in no position to claim the protection of a court of equity. See the opinion of Burr, J., in the case of *City of Yonkers* v. *Federal Sugar Refining Co.,* 136 App. Div. 701.

For the reasons hereinbefore stated the motion to make the injunction permanent must be denied and the stay contained in the order to show cause is hereby vacated and set aside.

Ordered accordingly.