MEYER BANK et al., Copartners Doing Business under the Name of BANK ELECTRIC Co., Respondents, *v.* BOARD OF EDUCATION OF THE CITY OF NEW YORK, Appellant.

First Department, March 25, 1952.

*Nelson Rosenbaum* for respondents.

*Andrew Bellanca* of counsel (*Seymour B. Quel* with him on the brief; *Denis M. Hurley, Corporation Counsel,* attorney), for appellant.

*Per Curiam.* The plaintiffs bring this action in fraud and deceit to recover increased costs and expenses over a fixed fee in completing a contract for electrical work in a school building.

The defendant advertised for bids on (1) general construction, (2) plumbing and drainage, (3) heating and ventilating, and (4) electrical work and fixtures.

It appears that the plumbing and heating contracts were not let at the same time as the contracts for general construction and electrical work.

The gravamen of the plaintiffs' complaint is that the defendant impliedly represented that all four contracts would be awarded at the same time, that the plaintiffs relied on such representation, that the defendant failed to award all four contracts at the same time or advise the plaintiffs that the contracts would not be simultaneously awarded, and that the plaintiffs were deceived thereby and suffered damage by way of increased costs and expenses in the performance of their contract with the defendant.

The jury returned a verdict in favor of the plaintiffs.

We think, however, that the plaintiffs failed as a matter of law to establish actionable fraud on the defendant's part. There was no representation that all contracts would be let

at the one time. The total bids exceeded the estimate of costs and appropriation for the project. The failure to award all contracts simultaneously or to advise the plaintiffs of inability to grant the same until additional funds were available cannot support a claim of fraud and deceit. No contract can be let in the absence of a specific appropriation sufficient to pay the estimated expense. (See New York City Charter, §§ 221, 224, 891, and Administrative Code of City of New York, §§ 93c–3.0, 223–1.0, 891–1.0.) Further, the instructions to bidders in this case gave notice to the plaintiffs that the defendant reserved the right to reject any and all bids.

We also think that no causal connection was established between the alleged fraudulent representation and the increased cost to the plaintiffs in fulfilling their contract. The defendant in no way delayed or interfered with plaintiffs' work. The delay was occasioned by the general contractor's inability to obtain a delivery of the necessary steel as scheduled, not by the defendant's failure to award the plumbing and heating contracts simultaneously with the contracts to the plaintiffs and the general contractor. The plaintiffs could not start their part of the job until the general contractor had completed his preliminary work. This was the situation regardless of when the other contracts were let. All the mechanical contractors (including the plaintiffs) were able to commence their work promptly after the general contractor had completed the erection of the steel work.

The judgment appealed from should be reversed, with costs to the appellant, and the complaint dismissed, with costs.

VAN VOORHIS, J. (dissenting). Plaintiffs are engaged as copartners in the electrical contracting business. They were the lowest bidders to perform the electrical work for an addition to Public School 35 in Brooklyn. They have obtained a judgment entered upon the verdict of a jury for $16,000 damages against the board of education of the city of New York, defendant-appellant. This recovery is in addition to the contract price which has been paid. The damages were due to delay in the starting and completion of the work. The theory of liability is fraud in inducing plaintiffs to refrain from withdrawing their bid or from canceling their contract during a period of rising costs, by misrepresentation and concealment of facts indicating that the work could not be undertaken by defendant at or near the time when it was advertised to begin. Discovery of the facts constituting this fraud was not made, as the jury could find,

until after the work had been completed and the contract price paid. No charge is made that any individual profited from any wrongful act, the contention being simply that plaintiffs were wronged by an overzealousness in the interest of the board of education.

Appellant contends that the complaint should have been dismissed by the trial court upon the law. The judgment should be affirmed, in my view, for reasons that require to be stated in some detail.

Bids for four contracts were advertised for the construction of this entire public work, which were received and opened on July 8, 1946, the lowest bids being as follows:

| | |
|---|---:|
| General Construction | $1,191,840 |
| Plumbing & Drainage | 78,000 |
| Heating & Ventilating | 178,300 |
| Electrical Work & Lighting Fixtures | 83,500 |
| | $1,531,640 |

The total of these low bids was upwards of 50% in excess of the moneys appropriated and available to defendant for this project. Without the appropriation of an additional sum of money sufficient to cover them all, none of these bids could legally be accepted. Section 221 of the New York City Charter provides that the capital budget shall specify the capital projects which may be undertaken during the ensuing calendar year, and shall fix the maximum amount of the new obligations of the city which may be authorized during such year to be incurred on account of each such project and each pending project, and the nature, duration and maximum amount of the obligations which the comptroller may be authorized to issue for the liquidation of such liabilities.

Section 224 provides that if the lowest responsible bids for any such project shall exceed the amount authorized, the latter may be increased by not more than 15% by resolution of the board of estimate, except that the capital budget may be amended in accordance with a recommendation from the city planning commission approved by the affirmative vote of two thirds of the members thereof.

Section 891–1.0 of the Administrative Code provides that no agency (defendant is by definition an agency for this purpose) shall incur a liability or an expense for any purpose in excess of the amount appropriated or otherwise authorized therefor.

In the face of these mandatory requirements, appellant was confronted on July 8, 1946, by a problem, which was aggravated three days later by denial by the Federal Civilian Production Administration (C.P.A.) of permission to undertake the project.

In order to extricate itself from this dilemma, defendant adopted several measures which seem to me to have been more effectual than fair or frank. On July 18, 1946, defendant resubmitted its application to the C.P.A., stating that the estimated cost of the project was $1,050,000, notwithstanding that the bids had already been received totaling $1,531,640. Defendant further certified to the C.P.A. that '' The appropriation of the money for the construction of this school has been made by the City '', although less than two thirds of the required amount had been appropriated. On July 30, 1946, the C.P.A. approved appellant's permit, but with a statement that if any of the certified facts proved to be false, it would be ground for immediate cancellation. Defendant further certified that it would start construction within thirty days after C.P.A. authorization, and that the building would be completed within 450 days after the start of construction. This promise must have been known by defendant-appellant to be impossible of fulfillment when it was made in the application; by the time when the C.P.A. permit was issued, it had become a certainty that the capital budget would not be amended for 1946.

Appellant knew all of this before awarding the electrical contract to plaintiffs on July 31, 1946. On August 27th, appellant notified plaintiffs that the time for performance under their contract commenced to run from that date, although the jury could have found, and their verdict indicates that they did find, that appellant then knew that work by plaintiffs could not be commenced until more than six months later.

Instead of rejecting all of the bids, or frankly stating its problem to plaintiffs and obtaining their consent to the delay, a complicated plan was devised and finally carried out by appellant which discriminated unfairly against plaintiffs. The plumbing and heating bids were rejected, but not those for the general construction and electrical work. This plan was conceived soon after the bids were opened on July 8th, and is mentioned in a report dated July 23d from an engineer in the budget director's office in the board of estimate, which contained the following qualified recommendation, that was acted upon: '' While the proposal to let only general construction and electrical work at this time is not considered best practice for building construction, which is a highly integrated process,

there appears to be no alternative to such procedure except deferment of the entire work until conditions are more favorable. If work proceeds now, and on the basis proposed, the City may expect increased construction costs as well as additional engineering expenditures attendant upon construction not being fully integrated and extending over a longer period.''

With this report before it on July 25, 1946, the board of estimate appropriated an additional sum of $287,803 for the general construction and electrical contracts so as to include the low bids for those two contracts, '' with the understanding that an increased aggregate estimate of cost will be approved at a later date as funds are made available.'' The latter statement meant simply that not enough money to undertake the project had been appropriated, and that the plumbing and heating contracts would be let later when, as and if the necessary subsequent appropriation were to be passed. Without informing plaintiffs of this program, defendant awarded the general construction contract for $1,191,840 and the electrical contract to plaintiffs for $83,500 on July 31, 1946. The plumbing and heating contracts could not be awarded and were not awarded until January 20, 1947. Work under them did not begin so as to enable plaintiffs to begin performance of the electrical contract until April 14th. Defendant conceded at the trial that the reason on account of which these contracts were not awarded was that there were insufficient funds for the entire work.

The absorption of the appropriation for the whole construction project by the general construction and electrical contracts alone, was clearly illegal. The purpose of the limitations in the City Charter and in the Administrative Code is to prevent municipal agencies from committing themselves to the construction of public works in excess of money allocated to such purposes in the capital budget and appropriated by the board of estimate. A public school without plumbing or heating would be useless. If $1,275,340 were to be expended for general construction and electrical installations alone, this would either represent a total loss or commit the city to appropriate enough additional funds to complete the work. Such a commitment is precisely what the Charter and section 891–1.0 of the Administrative Code prohibit, until the sum required for the whole project has been appropriated.

The necessary increase in the 1946 capital budget for this project would have exceeded 15%; consequently it could not be done without a recommendation from the city planning commission. The commission subsequently included an allot-

ment of $349,000 for completion in the 1947 capital budget, but declined to alter the capital budget for 1946. On January 16, 1947, the board of estimate appropriated an additional sum of $292,734 for the plumbing and heating contracts, and approved an increase in the estimated cost for the four contracts raising the total to $1,571,074, which slightly exceeded the aggregate of the four low bids that had been submitted on July 8, 1946. On January 20, 1947, appellant awarded the plumbing and heating contracts at an increase of about 15% above the amounts of the rejected bids for the same work which had been received on July 8, 1946. Plaintiffs obtained no such increase although their costs likewise had mounted. During the interval Federal wage and hour regulations had lapsed, and prices of all labor and materials had increased substantially.

Plaintiffs were not informed that the letting of the plumbing and heating contracts was to be deferred indefinitely, and that they were to be treated differently from the plumbing and heating contractors. They did not know that they were being deliberately subjected to the fluctuations in labor and material costs over an extended and indeterminate period. The facts were kept from their knowledge which made their contract not binding upon the board of education. They did not know what was taking place in the inner counsels of the city planning commission, the board of estimate, the city council, the budget director's office or of the defendant. Although plaintiffs may have been chargeable with notice that the bids opened on July 8, 1946, exceeded the appropriation, the city comptroller certified pursuant to section 93c–3.0 of the Administrative Code on August 27th, that sufficient funds had been appropriated to pay for the cost of performance when plaintiff's contract was let on July 31, 1946. Plaintiffs were not required to look beyond the comptroller's certificate in order to ascertain whether money had been appropriated for the other building contracts also. They were justified in assuming that it warranted that the requirements of law had been followed, and that an appropriation had then been made sufficient to cover the plumbing and heating contracts in order that the whole project might proceed. The very fact that plaintiff's contract was let indicated this to be true, since appellant lacked authority to make any contract until enough funds had been appropriated to pay the known cost of all of the construction work. When plaintiffs sought to discover the cause for the delay, they were informed that it resulted from inability of the general construction contractor to obtain steel and other necessary materials. They did not

learn until after the school had been completed in 1949, and they had employed an attorney, that there never had been a chance of starting the electrical work before the spring of 1947.

The delay thrust upon plaintiffs by this maneuvering was costly. The total time consumed from the beginning of the contract period until completion of the work was 880 days, or nearly twice the contract time of 450 days. Plaintiffs were obliged to work on the job during 654 calendar days, which was much longer than was required for the actual installation of the electrical work. Enlarging the time to be consumed was expensive in itself, aside from increases in material and labor costs. The actual cost of performance, according to plaintiffs' evidence, was $117,227.38. This represented a loss of $33,072.38 after crediting $84,155 which was paid.

Sustaining a loss does not ordinarily provide a contractor with a cause of action, but what happened here amounted at least to a constructive fraud. The jury were within their province in determining that plaintiffs would have withdrawn their bid and avoided this loss, if they had not been misled by defendant. It is obvious that all four of these construction contracts had to be performed at or about the same time, and that if any of them could not be let it would undermine the whole project. The building could not be constructed first and the plumbing, heating or electric wiring be added later. These are all integral parts of the same building, and the work under the different contracts had to be co-ordinated, as the specifications required. There was an implied representation by defendant, in letting plaintiffs' contract, that the other contracts would be let reasonably soon. Building conditions were complicated by reconversion and strikes, but plaintiffs were entitled to be told the true facts, and not be deliberately led to believe the opposite. The law reads a requirement into every contract that the parties shall deal in good faith. Possibility of delay due to unsettled conditions is a different matter from concealment of facts which would have established that defendant lacked legal authority to proceed at all. The very fact that a contract such as this is drawn so as to leave the contractor virtually at the mercy of defendant emphasizes the duty to deal fairly and openly. In a contract " no matter how strong the provision to shield from liability may be, there is no protection unless good faith is observed." (*Industrial & General Trust* v. *Tod,* 180 N. Y. 215, 226.)

To be sure, plaintiffs had to run the risk of unforeseen delays in the performance of the work, but defendant had no right to

mislead plaintiffs, or to threaten confiscation of the deposit and suit by the other contractors and the imposition of liquidated damages, if plaintiffs were to withdraw from a contract which defendant knew that it had no right to let in the first place. It has been held that where a person has been drawn in to perform work upon a defendant's real property by misrepresentation and concealment, he is not bound by the terms of the contract and may recover the reasonable value of the work (*Rickard* v. *Stanton,* 16 Wend. 25 26–27, cited with approval in *Hanlon* v. *Macfadden Publications,* 302 N. Y. 502, 512). Statutes designed to prevent the public from being imposed upon are to be used as a shield and not as a sword (*Harlem Gaslight Co.* v. *Mayor of City of New York,* 33 N. Y. 309, 329). Defendant, as an arm of the State, in contracting with its citizens must deal equitably and with "frank statement of its purpose, without subterfuge or circumlocution" (*Atlanta Constr. Co.* v. *State of New York,* 103 Misc. 233, 236).

In the light of these principles, the argument is neither sound nor fair that the progress of the work would have been interrupted due to lack of steel for the general construction contractor, even if defendant could legally have let the contract. Therefore, it is argued, plaintiffs have failed to prove that their damages resulted from any concealment or misrepresentation by defendant which may have occurred. Such an argument overlooks that plaintiffs had the right to withdraw their bid or to withdraw from their contract, and would have sustained no loss if they had done so. The jury properly found that plaintiffs entered their bid and stayed with the contract in reliance upon defendant's implied representation that the four contracts would be let without undue delay, and would not have done so if they had known that the work could not possibly be commenced short of nine months from the submission of the bid, regardless of what unforeseen delays might occur. A contractor may be held to have assumed the risk of unknown contingencies, but fairness required that plaintiffs be informed of a postponement which was inevitable from the beginning of the contract period, instead of being led to believe that the necessary funds had been appropriated and of being threatened if they withdrew.

If plaintiffs had been informed of the facts and had nevertheless elected to maintain their bid or contract in effect, they would not have cause to complain. If they had decided to continue after being informed that their performance had to be lengthened and postponed, they might have taken steps to pro-

tect themselves against the consequences. That is not the situation.

In *Rickard* v. *Stanton* (16 Wend. 25, *supra*) it was held that a person contracting to do construction work for a private individual under such circumstances might recover on *quantum meruit*, without regard to the price specified in the agreement. Public policy may dictate that recovery in a case such as this be limited to the amount actually lost by plaintiffs as a result of having been induced to continue with the work, which would appear to be the correct measure of damage (*Reno* v. *Bull*, 226 N. Y. 546). No exception was taken, however, to the instruction to the jury that any recovery should be in the amount of the increased costs for labor and materials. In view of the evidence that plaintiffs lost substantially more on the contract than the jury's verdict of $16,000, defendant is not in position to object to the use of the measure of damage charged, to which no exception was taken. The jury were correctly instructed to determine whether plaintiffs relied upon defendant's implied representation that all four construction contracts would be awarded simultaneously, and whether the failure of defendant to advise plaintiffs that these contracts would not be awarded in that manner amounted to a fraud upon plaintiffs. All of these questions were resolved in plaintiffs' favor. The verdict was conservative in amount, was clearly warranted, and the judgment appealed from should be affirmed, with costs.

Cohn, J. P., Callahan and Shientag, JJ., concur in *Per Curiam* opinion; Van Voorhis, J., dissents in opinion in which Foster, J., concurs.

Judgment reversed, with costs to the appellant, and judgment is directed to be entered dismissing the complaint herein, with costs. Settle order on notice.